| | |
|---|---|
| DR. COLLEEN ERBEL, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )    No.  3:04-CV-555 |
| | )    (Phillips/Guyton) |
| MICHAEL O. JOHANNS, Secretary | ) |
| United States Department of Agriculture, | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

In the matter before the Court, plaintiff alleges claims against her former employer for failure to accommodate her disability pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"); hostile work environment based upon gender, disability, and protected activity in violation of the Rehabilitation Act and Title VII of the Civil Right Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"); unlawful suspension based upon gender, disability, and protected activity in violation of the Rehabilitation Act and Title VII; constructive discharge; and retaliation for engaging in a protected activity. Defendant filed its motion for summary judgment on all claims [Doc. 23]. Parties have been given sufficient time to file responses, replies, and sur-replies. For the reasons that follow, defendant's motion for summary judgment [Doc. 23] is **GRANTED in part** and **DENIED in part**.

## I.    Summary of the Facts

As the law requires, all disputed facts and inferences are resolved most favorably for the movant.  As many of the facts are utilized to support more than one claim, the Court will organized its summary of the events in chronological order.  Furthermore, the Court merely provides an abridged summary of facts for the purposes of this opinion.

Plaintiff Dr. Colleen Erbel ("Dr. Erbel") began work as a veterinarian with the Department of Agriculture, Animal and Plant Health Inspection Service (the "Agency") in October of 1987.  In 1990, Dr. Erbel became Area Veterinarian in Charge ("AVIC") for the Agency over the state of North Carolina.  In 1993, Dr. Erbel changed positions to a Veterinary Medical Officer ("VMO") in the Agency's Eastern Region of Tennessee, where she stayed until leaving Agency employment in 2002.   Throughout her career, her performance appraisals were fully satisfactory or better until the events subject to this litigation transpired.

In 1998, Dr. Robert Southall ("Dr. Southall") was appointed as the AVIC in Tennessee, and he began supervising plaintiff and the other VMOs in Tennessee.  That year, Dr. Southall assigned plaintiff to conduct an epidemiological survey.  While other colleagues, who were male, received cash awards or other benefits for such projects, plaintiff did not receive a cash award after the completion of the epidemiological survey. Although plaintiff believed Dr. Southall's actions to be discriminatory, she did not contact an EEO counselor at that time.

Thereafter, in October of 2000, Dr. Southall gave the plaintiff a performance review. In a self-evaluation performed in advance of the review, the plaintiff rated herself as "does not meet fully successful" with respect to section work (assignment discretion) and administrative duties. Apparently, around that time, plaintiff was moving her residence and thus her home office, as well as completing an extended 30 day detail assignment in Michigan.[1] Plaintiff was having difficulty re-organizing and re-establishing her work office, systems, and routines. Although Dr. Southall rated the plaintiff as "fully successful" and above, he sent plaintiff a letter informing her that the two performance areas that plaintiff had identified herself were indeed not up to the standard of field VMOs. In response, plaintiff informed Dr. Southall that she was going to contact the employee relations specialist; that she wanted Dr. Southall to withdraw the letter; and that she wanted to be placed upon a performance improvement plan ("PIP"). Subsequently, Dr. Southall withdrew the letter. Further, in January of 2001, when plaintiff did not receive requested support, plaintiff confidentially advised Dr. Southall of her mental disability in the context of requesting accommodations to return her back to normal functioning. Dr. Southall notified the employee relations specialist of plaintiff's disability claim and about plaintiff's inquiry for information with respect to requesting accommodation. Plaintiff believes that Dr. Southall may have disclosed information regarding her disability to others notwithstanding plaintiff's request for confidentiality.

Around that time, that is in January of 2001, plaintiff received a reprimand related

---

[1]Plaintiff asserts that she believed two other male doctors were in line to go on extended detail before her in the rotation; however, she accepted the Michigan assignment.

to cell phone usage.  In July of 2000, Dr. Southall had asked plaintiff about a number of charges on her cell phone and contemporaneously issued a memorandum to Tennessee area employees giving instructions on appropriate use of government cell phones.  Plaintiff states that she was advised that she could use her cell phone through the problematic move of her office/residence and that she contacted Dr. Southall to pay for personal calls in August of 2000.  Nonetheless, in October of 2000, Dr. Southall began a process of reprimanding plaintiff for inappropriate government cell phone usage.  Dr. Southall did not discuss the cell phone use during an October 2000 performance review; rather, plaintiff was presented with a letter of reprimand in January, 2001.  Plaintiff asserts that other male non-disabled peers have participated in similar cell phone activity with no reprimand.

On January 29, 2001, in response to plaintiff's accommodation inquiry, Dr. Southall sent plaintiff a letter advising her as to the method to request accommodations, specifically asking plaintiff to have her doctor review her job description to assess the impact of her disability on her work as a field VMO;  asking plaintiff to provide a medical release; and further imposing a two week deadline for plaintiff to deliver medical documentation to support an accommodation.  Ultimately, plaintiff did not protest the Agency's conclusion that plaintiff was not making a request for an accommodation at that time; however, plaintiff had initiated a Conflict Prevention Resolution ("CPR") event with Dr. Southall and was in the process of scheduling a mediation.  Plaintiff asserts that she believed that she could address her concerns for an accommodation in this venue.

In April of 2001, a CPR mediation took place between plaintiff and Dr. Southall.

Plaintiff claims that she initiated that event because a fellow VMO had informed her that she was being discussed negatively in the Nashville area office when, at the same time, Dr. Southall had given her no indication of problems with her work. During the mediation, plaintiff participated in a discussion and received guidance regarding her job responsibilities and clarification regarding her relationship with Dr. Southall. Plaintiff understood that her requests for accommodation were denied. In addition, as a result of the mediation, Dr. Southall created a list of duties and responsibilities and circulated it to all VMOs under his supervision. Plaintiff claims that this list became a tool opening opportunity to create a record of misconduct. Dr. Southall began a series of exhaustive memos relating to plaintiff's late reporting, inaccuracies in paperwork, and similar misconduct.[2]

As a result of the mediation, Dr. Southall was to meet monthly with plaintiff to provide plaintiff with feedback as to job performance and expectations. Dr. Southall only met with plaintiff for the first monthly meeting, thereafter stating that his travels to Florida did not permit time for such meetings. In the first meeting in May, which also happened to be the normal mid-year appraisal, Dr. Southall reported that he was satisfied with plaintiff's performance. Dr. Southall continued to voice satisfaction, that is until plaintiff received an unfavorable evaluation in February of 2002.

---

[2]Plaintiff asserts that the memo writing escalated after management had knowledge of plaintiff's EEO charge; that the memos report "petty misdeeds;" that many of the "misdeeds" are disputed; and that she was forced to reply and defend against the steady stream of memos. Further, it appears that Dr. Southall had a spreadsheet prepared to scrutinize plaintiff's paperwork. Only after it was pointed out that only scrutinizing plaintiff's conduct was unfair, did the tracking and review of other non-disabled male VMOs occur.

In January of 2002, Dr. Southall notified all Tennessee VMOs of a request from the region for volunteers for detail assignments in New Jersey, Chicago, and Detroit. When no volunteers came forward, Dr. Southall sent plaintiff an e-mail stating that it was her turn to take a 30 day detail in New Jersey. Plaintiff asserts that other nondisabled male VMOs were in front of her in the detail rotation; that a two week detail would have been sufficient; that another VMO agreed to fill a two-week rotation, which in effect would have satisfied the request for a VMO; and that she had annual leave scheduled during the requested dates. Plaintiff returned an e-mail stating that she could not go on the detail for medical reasons. Plaintiff was sent a letter dated January 31, 2002 requesting medical documentation to support an accommodation related to the detail. Plaintiff expressed concern in signing a release to the Agency and also felt that the two week deadline to gather and deliver medical information was too short a time period.

In February 2002, Dr. Southall presented Plaintiff with her performance appraisal for the period from October 1, 2000 to December 31, 2001, in which he rated Plaintiff overall as "marginal" based upon rating her performance of administrative duties as not fully successful. Attached to the appraisal form was a statement supporting the ranking of "not fully successful" on administrative duties. Plaintiff disputes the accuracy of Dr. Southall's statement as to frequency and seriousness of timeliness and inaccuracies in her paperwork, and the examples he used to justify the rating. Plaintiff claims that Dr. Southall used instances outside of the rating period. Further, plaintiff submits that other individuals, non-disabled male VMOs, who were not singled out, made many of the same mistakes. The Agency asserts that plaintiff agreed with the evaluation with the exception of issues

regarding travel vouchers. As a result of the evaluation, plaintiff contacted an EEO counselor on February 14, 2002 to report various forms of discrimination, which include discrimination based on sex and disability.

Also in February of 2002, Dr. Southall worked with the employee relations specialist to prepare a leave restriction letter that required plaintiff to follow strict guidelines for sick leave approval. The letter was sent to plaintiff on February 21, 2002 and required plaintiff, for the period of one year, to request sick leave within the first 30 minutes of her scheduled start time and to provide a certification signed by her physician to support each instance of sick leave within three days of her return to duty. Plaintiff was informed by the letter that failure to comply with the restriction would result in absences being charged as AWOL and potential discipline. The bases for the letter expressly included incidents regarding alleged irregular use of leave or use of leave contrary to approved leave on February 1, 6, 7, and 19 of 2002. Plaintiff disputes that she inaccurately reported these incidents and/or that Dr. Southall's actions caused her to change her leave days.

After plaintiff provided medical documentation on February 14, 2002, the Agency postponed her detail to New Jersey to allow time to evaluate and review the medical records in considering whether to grant or deny an accommodation that would allow plaintiff to be exempt from the New Jersey 30 day detail.[3] By letter dated February 21, 2002, Dr. Southall again requested additional information from plaintiff's physician with respect to the

_____

[3]Plaintiff claims that another VMO volunteered to fill the New Jersey detail but was told that the detail was being held for the plaintiff.

request for accommodation. After the information was provided on February 28, 2002, plaintiff was not required to go on the detail to New Jersey. Thereafter, plaintiff sought accommodation to be exempt from all 30 day details.

On March 26, 2002, Dr. Southall sent plaintiff a letter proposing a 14-day suspension for failure to follow instructions and failure to follow instructions in a timely manner. The Agency states that Dr. Southall first proposed this discipline to his supervisor, Dr. Dick, on February 15, 2002, because of three incidents that had been brought to Dr. Southall's attention beginning in late January 2002. Plaintiff asserts that Dr. Southall routinely asked staff members about her and even threatened staff members with termination if they were reluctant to "cooperate" by providing negative information about her. The suspension involved three alleged incidents: (1) plaintiff did not accompany co-workers to inspect a livestock market in preparation for potential citations in accordance with Dr. Southall's instructions; (2) plaintiff was late in delivering a presentation and provided some inaccurate information during the presentation; (3) and plaintiff's actions involving completion of a trace of infected sheep, which caused the unnecessary euthanization of one sheep. On March 29, 2002, the day after plaintiff learned of the proposed suspension, she called the EEO Counselor, Beatrice Jacobs ("Jacobs"), to report the action taken against her. Plaintiff documented the report in her weekly activity report and faxed a copy of the documents relevant to her suspension to Jacobs. Further, plaintiff's attorney communicated with Jacobs regarding the suspension within the 45 day window approximately six times. Defendant disputes the notice stating that only on May 14, 2002 did the plaintiff notify the EEO office for the first time that Dr. Southall had proposed a 14 day suspension for plaintiff.

On May 21, 2002, an oral reply conference regarding the three alleged instances of misconduct was held. The matter was taken under advisement.

Also in May of 2002, additional information was requested regarding plaintiff's request for accommodation to be exempt from all 30 day details, and the information was provided on June 5, 2002. By letter dated July 12, 2002, plaintiff's request to be relieved from all details of 30 days or more was formally granted and the Agency "determined that no further action is warranted at this time." Plaintiff was instructed that "if [her] needs change, [she should] provide the appropriate medical documentation along with a written request for any additional accommodations that may be necessary."

Around that same time period, the plaintiff and Dr. Southall exchanged e-mails regarding requests for accommodation and assistance. After Dr. Southall questioned plaintiff's ability to manage her time, plaintiff asked Dr. Southall, what she had "failed to do" that her "requests for assistance have not been considered?" Dr. Southall responded that he was not aware that plaintiff had made a "formal request" for assistance. Plaintiff then returned the email on June 26, 2002, asking "what constitutes a formal request" for accommodation. Dr Southall did not respond to plaintiff's e-mail. On July 16, 2002, plaintiff sent a letter to Dr. Southall, again asking how to make a "formal request" for accommodation.

On July 25, 2002, Dr. Southall wrote to plaintiff in response to these communications, reiterating that the agency has no medical documentation or request that would allow any accommodation other than the relief from details of 30 days or more. The letter instructed plaintiff to provide information from her medical providers if she needed additional accommodation, including information about (1) "the nature, severity, and duration of [plaintiff's] impairment"; (2) "the activity or activities that [plaintiff's] impairment limit[ed]"; (3) "the extent to which the impairment limit[ed] [plaintiff's] ability to perform the duties of [her] position"; and (4) "why the requested reasonable accommodation is needed." Plaintiff responded by letter requesting clarification and additional time to provide the information.

On August 12, 2002, plaintiff received the Report of Oral Conference regarding the three instances of misconduct which purportedly warranted a suspension. Two of the charges were sustained, one with mitigating factors. The plaintiff disputes that her actions were improper; that Dr. Southall contributed to the instances due to poor communication; others, who were not disciplined, shared responsibility of tracing the sheep; the official was biased for the Agency; and the official was not aware of the burden of proof to sustain the instances of alleged misconduct, which fundamentally indicates improper review of her "offenses." Nevertheless, a ten day suspension was imposed from August 26, 2002 through September 4, 2002.

It appears that plaintiff did not return to work after the last day of her suspension, that is September 4, 2002. Plaintiff states that her emotional distress had escalated to a

degree that she could no longer tolerate working in the present environment and successfully perform her job without accommodations. Thereafter, plaintiff requested eleven specific accommodations by letter dated September 13, 2002. On September 23, 2002, plaintiff submitted her application for disability retirement to the Agency for completion of the supervisor's portion. In response to the plaintiff's September 13, 2002 letter, on October 4, 2002, the Agency sent a letter denying some accommodation requests, stating essentially that some accommodations were already in effect as part of her relationship with the Agency, and also stating that they needed medical documentation to support requests for accommodations. On the same day, plaintiff's physician sent a letter to the Agency essentially requesting the accommodations listed in plaintiff's September 13, 2002 letter.

Also on October 4, 2002, plaintiff withdrew her disability application because she decided that she submitted the application too hastily and that she wished to provide more details. Plaintiff applied again for disability retirement on October 21, 2002. Ultimately, plaintiff was granted disability retirement.

As a result of the above events, plaintiff filed her complaint in this District Court on November 22, 2004. In her response to the Agency's motion for summary judgment, plaintiff asserts that defendant failed to accommodate her disability pursuant to the Rehabilitation Act; that she was subjected to a hostile work environment based upon gender, disability, and protected activity in violation of the Rehabilitation Act and Title VII; that she was unlawfully suspended based upon gender, disability, and protected activity

in violation of the Rehabilitation Act and Title VII; that she was constructively discharged; and that the defendant retaliated against her for engaging in a protected activity.

## II.    Law applicable to Rule 56 of the Federal Rules of Civil Procedure

Rule 56 of the  Federal Rules of Civil Procedure provides that summary judgment will be granted by a court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  The burden is on the moving party to conclusively show that no genuine issue of material fact exists.  A court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir.1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56 of the Federal Rules of Civil Procedure, the nonmoving party is not entitled to a trial simply on the basis of allegations.  The non-moving party is required to come forward with some significant probative evidence, which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.  *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 220 (6th Cir.1996).

## III.    Motion for summary judgment and applicable law

A.    Failure to Accommodate

Congress has authorized federal employees to sue the federal government for violation of their civil rights; however, this right is conditioned upon the "plaintiff's satisfaction of 'rigorous administrative exhaustion requirements and time limitations.' " *Horton v. Potter*, 369 F.3d 906, 910 (6th Cir. 2004) (quoting *McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002) (quoting *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976))).   As part of the exhaustion requirements, the "aggrieved person must initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1) (2003); *see also Horton*, 369 F.3d at 910.  "In the case of an employee who claims to be the victim of a 'discrete discriminatory act,' the limitation period for bringing such charge begins to run from the date on which the act occurred."  *Id.*  If the employee's claim concerns a continuing violation claim, the employee must identify a discriminatory act contributing to a continuing violation that occurred within 45 days of the request for counseling.  *Id.*  An agency will dismiss a federal employee's claim in whole, if an employee fails to comply with the 45-day limitation period.  29 C.F.R. § 1614.107(a)(2) (2003).

The failure to accommodate a disability is a discrete discriminatory act, which is subject to the reporting requirement.  *See Butler v. Potter*, 345 F.Supp.2d 844, 851 (E.D. Tenn. 2004) (analogizing a disability accommodation case to a religious accommodation

13

case); *Hall v. The Scott Co.*, No. 2:05-CV-732, 2005 WL 3499933 at * 5-6 (S.D. Ohio Dec. 21, 2005) (citing *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2nd Cir. 2003). The *Elmenayer* court explained:

> The rejection of a proposed accommodation is a single completed action when taken, quite unlike the "series of separate acts" that constitute a hostile work environment and "collectively constitute" an unlawful employment practice. Although the effect of the employer's rejection continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that *Morgan* offered as examples of a discrete act.

*Id.* at 135 (citations omitted).

A court must also consider the issue of a "renewed" request for accommodation. After reviewing other court decisions, the Court concludes that "permitting [a plaintiff] to bootstrap an expired claim beyond the statue of limitations would ignore the policy behind the statute of limitations." *Hall*, 2005 WL 3499933, at *6; *see also Harper v. BP Exploration & Oil, Inc.*, 134 F.3d 371, at *4 (6th Cir. 1998) (unpublished table decision) (holding that "[i]t would defeat the policy behind a statute of limitations to allow a stale and isolated claim to be revived at any time in the future that a continuous pattern of violations developed"); *see also Zdziech v. DaimerChrysler Corp.*, 114 Fed. Appx. 469 (3rd Cir. 2004). In other words, the 45 day time period may not be restarted by simply renewing the request.

Also, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Edwards v. United States EPA*, 456 F.Supp.2d 72, 102 (D.D.C. 2006) (quoting

14

*Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999)). An employer is "not obligated to provide accommodation until plaintiff ha[s] provided a proper diagnosis ... and requested specific accommodation." *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 437 (6th Cir. 1998). Moreover, when an employer establishes a fixed set of procedures to request accommodations, the employee's failure to file a proper request dooms her claim for failure to accommodate. *Edwards*, 456 F.Supp.2d at 103. "[T]he 'process of determining the appropriate reasonable accommodation' commences when 'a qualified individual with a disability has requested provision of a reasonable accommodation.'" *Id.* "[A]n 'employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement.'" *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000). The employer is "entitled to require that [the employee] provide medical documentation sufficient to prove that he [or she] had a condition requiring accommodation." *Id.*

In the instant matter, the record consistently reflects that the plaintiff was advised that her 2001 requests for accommodation were denied. For example, plaintiff's complaint alleges that "in response to her requests for accommodation, she was told there was no money for accommodation, she did not need an accommodation, instead she just needed to pray because Satan wanted her to fail." Further, in plaintiff's letter dated August 5, 2002, plaintiff states the following:

> I first advised you in September of 2000, that I had been having a very
> difficult time completing work assignments due [to] my ability to organize the

> work after relocating my office and home.  At the time I was not comfortable
> in revealing my disability to you....  I asked for information about requesting
> accommodation in January of 2001....  [When] I asked you again in April of
> 2001[,] you told me that there was no money available for accommodation.

Additionally, in plaintiff's e-mail correspondence to Southall dated June 26, 2002, plaintiff

states in relevant part:

> I requested information from you in January of last year as to what I needed
> to do to request reasonable accommodation....  When I asked again at the
> CPR, both you and Barbara Marx told me that accommodation was not
> financially possible....

Lastly, when the plaintiff was asked at her deposition if she believed that the issue of

reasonable accommodation had been rejected and was not on the table when she left the

mediation, the plaintiff replied in the affirmative.

In effect, the plaintiff was advised that her accommodation requests before April of

2001 were denied.  As plaintiff accurately notes, the limitation period begins to run on a

claim for employment discrimination when the employer makes and communicates a final

decision to the employee.  *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980).

"Once the employee is aware or reasonably should be aware of the employer's decision,

the limitations period commences." *E.E.O.C. v. United Parcel Service, Inc.*, 249 F.3d 557,

562 (6th Cir. 2001), *cert. denied*, 535 U.S. 904 (2002) (citations omitted).  Plaintiff did not

timely contact an EEO counselor to dispute the denial of her accommodation request.

Accordingly, all requests before April of 2001 and any renewed requests thereafter, are

barred as untimely.

The record also reflects a request for accommodation on January 29, 2002. Plaintiff sent an e-mail to Dr. Southall stating that her medical condition would not allow her to withstand a 30 day detail. The request was processed and granted in full on July 12, 2002. Accordingly, no failure to accommodate claim can be sustained in relation to this request.

Further, the record, in particular plaintiff's affidavit to her EEO complaint, reflects that the plaintiff requested accommodation for her disability on February 12, 2002 during a performance evaluation.[4] As mentioned above, there was some confusion as to whether plaintiff was requesting an accommodation. Nonetheless, the request eventually materialized in a specific list of requests for accommodations by letter on September 13, 2002. After the Agency reviewed the accommodation requests, the defendant issued a letter dated October 4, 2002 addressing each of plaintiff's requests and requesting documentation to support accommodations if plaintiff wished to pursue the matter. Essentially, the letter denied some requests while stating that other requests had already been implemented or were a part of her employment. Plaintiff thereafter did not amend her EEOC complaint to include failure to accommodate or file a new EEO complaint within the 45 day time period. Accordingly, plaintiff did not exhaust her administrative remedies.

---

[4]Plaintiff indicates that she timely contacted the EEO counselor regarding her request to accommodate in February of 2001. As to the claims for failure to accommodate related to the 2001 requests, such claims are time barred.

Also, although the plaintiff cites to cases indicating that an employer's attempt at accommodation is a question of fact for the jury and that summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith, *e.g. Lenker v. Methodist Hosp.*, 210 F.3d 792, 797 (7th Cir. 2000), this question is not applicable here. The defendant did engage the plaintiff in her requests for accommodation. For instance, the record reflects that the Agency provided the plaintiff with a copy of the position description to give to her medical providers so that they could advise the agency of any needed accommodations, inquired as to the nature of the impairment as well as inquired to the extent the impairment limits her abilities, discussed accommodations with the plaintiff on numerous occasions in person and through correspondence, as well as considered the accommodations sought.

As the Court finds that the plaintiff did not exhaust her administrative remedies, which bars recovery on failure to accommodate, the Court need not discuss defendant's alternative ground of dismissal, that is, the plaintiff was no longer qualified.[5] In sum, plaintiff's claims regarding failure to accomodate in violation of the Rehabilitation Act are denied in full.

B.    Hostile work environment

---

[5]To establish a valid claim under the Rehabilitation Act for failure to accommodate a disability, the plaintiff must establish evidence that "(1) she is disabled; (2) *she is otherwise qualified for the position*; (3) her employer was aware of her disability; (4) an accommodation was needed, in that the causal relationship existed between the disability and the request for accommodation; and (5) the employer failed to provide the necessary accommodation." *Gerton v. Verizon South, Inc.*, 145 Fed. Appx. 159, 164 (6th Cir. 2005) (emphasis added).

Plaintiff alleges a hostile work environment based upon gender, disability, and protected activities in violation of the Rehabilitation Act and Title VII.[6]

Title VII makes it an unlawful employment practice for a covered employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex [.]" 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' ... includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993). Under Title VII, in order to make out a hostile-work-environment claim based on sexual harassment, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer failed to take reasonable care to prevent and correct any such harassment. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000); *see also Hickman v. Laskodi*, 45 Fed.Appx. 451, 453-54 (6th Cir. 2002). Members of one sex must be exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Knox v. Neaton Auto Prods. Mfg. Inc.*, 375 F.3d 451, 459 (6th Cir. 2004) (citations omitted).

---

[6]The Court finds that plaintiff's hostile work environment claim based upon protected activity is covered in plaintiff's retaliation claim. The Court will treat said claim as plaintiff's retaliation claim.

The prima facie elements of gender discrimination claims and disability claims are similar, but not exactly the same.    Under the Rehabilitation Act, a hostile work environment claim requires a plaintiff to demonstrate five elements: (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) defendant either knew or should have known about the harassment and failed to take corrective measures. *See Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997) (establishing the framework of proof under Title VII for sexual harassment); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir.1996) (holding that the elements of a hostile work environment claim are the same across discrimination contexts and applying those elements specifically to the Age Discrimination in Employment Act).   The plaintiff must present evidence that the defendant "relied upon" the disability in making its decision.   *Todd v. City of Cincinnati*, 436 F.3d 635, 637-38 (6th Cir. 2006).

A review of the parties' briefs indicates that the disputed issues is whether the plaintiff was subjected to a hostile work environment and whether any such environment was based upon gender and disability.   A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   *Harris*, 510 U.S. at 21 (internal quotation marks and citation omitted).   Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim. *Id.* at 21-22.

The Court must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Id.* at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

A hostile work environment claim is composed of a series of separate acts that collectively constitutes one unlawful employment practice. *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)). A charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. *Id.* at 122. In this case, although many acts upon which the claim depends occurred outside the filing period, the Court cannot say that they are not part of the same actionable hostile environment claim.

Plaintiff states the following facts in support of her hostile work environment claim. Dr. Erbel was the only female employee at the GS12 level or above in Tennessee; the only employee with a disability other than Dr. Southall, who has dyslexia; and no other employees sought disability accommodations or filed EEO complaints. After Dr. Erbel left the Agency, it immediately hired three male VMOs. Dr. Duenckle works part-time, and the Agency pays for his education. When VMO Dr. Allen Knowles and Dr. Southall had

difficulties working together, regional management invited Dr. Knowles to fly in to meet for a "discussion" about it. The communication resolved the issues and no formal discipline was pursued. Dr. Jere Dick, as Associate Regional Director, flew to Florida and met with a male VMO to communicate with him about misconduct matters, and no formal disciplinary actions were pursued. Dr. Dick, as an AVIC, implemented a PIP for a male VMO who was struggling with getting his work accomplished timely. The PIP assisted the VMO at improving his performance, and he is still with the Agency. When Dr. Knowles and Dr. Southall allowed tuberculin reagent to expire at the area office in 2002, this was a very serious incident that could have resulted in the spread of tuberculosis, but no one was reprimanded. In a letter to Dr. Southall on February 4, 2002, Dr. Erbel expressed her concerns about Dr. Southall's habit of referring to her as Ms. Erbel rather than Dr. Erbel. Soon thereafter (February 22), Dr. Southall wrote her again referring to her as Ms. Erbel, even though he does not use "Mr." to refer to the male VMOs. Dr. Knowles told Dr. Erbel that he wondered if she had a mental problem or if it was her time of the month. Dr. Southall told Dr. Erbel to document every hour of her day and send it to him on a weekly basis. None of the nondisabled male VMOs were instructed to document their daily activities this way. The only other person Dr. Dick has terminated as Associate Regional Director was a female VMO, for misconduct, but he does not recall the misconduct. While AVIC in Tennessee, Dr. Southall suspended only one other person besides Dr. Erbel, a female AHT. Not long after his promotion to AVIC in Florida, a female employee filed an EEO complaint accusing him of gender and disability discrimination. Female staff in the area office were uncomfortable with Dr. Southall's habit of always staring at their breasts, and one employee found it difficult to work for him because of this habit. For the last year

of her employment, Dr. Southall refused to meet with Dr. Erbel privately because he told her that he was afraid she would accuse him of sexual misconduct.

While the Court considers that some of the evidence submitted is hearsay or otherwise inadmissible, the Court finds that plaintiff is a member of a protected class and has presented sufficient evidence, when viewed favorable for plaintiff, to submit a discrimination case of hostile work environment based upon gender and disability to the jury for determination.

C.    Suspension

Plaintiff asserts that her suspension is a discriminatory discrete act based upon her gender, disability, and engagement in a protected activity.[7]  A Title VII gender discrimination claim is subject to the same exhaustion requirements as a Rehabilitation Act claim.  *See Horton*, 369 F.3d at 910.   Accordingly, a failure to contact an EEO counselor/office concerning discrete events within 45 days of the effective date of the personnel act bars any claims based upon those events.  29 CFR § 1614.105(a)(1).  Plaintiff received notice of the proposed suspension on March 27, 2002.  While there is dispute as to whether the plaintiff did in fact contact an EEO counselor regarding the proposed suspension, viewing the facts favorably for the plaintiff, the plaintiff has put forth sufficient evidence of timely contact with the EEO counselor on March 29, 2002 as well as other instances within the

_____

[7]Again, the Court finds that plaintiff's claim of discrimination related to the suspension based on protected activity is actually part of plaintiff's retaliation claim and will be treated as such.

45 day time period.  Plaintiff asserts that she documented the contact in her Weekly Activity Report; timely faxed the suspension documents to the EEO counselor receiving conformation of the fax; and engaged in multiple telephone conversations regarding the suspension during the 45 day time frame.

The Agency asserts that plaintiff did not timely amend her complaint to include the suspension claim; however, plaintiff asserts that her June 2002 EEO complaint references her counsel's May 14, 2002 letter to the EEO counselor requesting removal of the proposed suspension.  Further, plaintiff stated her claims and legal theories to encompass the suspension discussed with the EEO counselor.  The Court also notes that the suspension was investigated as referenced in the Agency's Report of Investigation.  In light of the circumstances, the Court finds that the plaintiff did exhaust her administrative remedies with regard to the suspension.

Further, the Court finds that plaintiff has presented a prima facie case of a wrongful suspension as well as presented sufficient evidence of pretext.  For claims such as plaintiff's that lack direct evidence of intent to discriminate, the well-established *McDonnell Douglas/Burdine* burden-shifting framework applies to claims of discrimination brought under Title VII.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  To establish a prima facie case of gender discrimination under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), the plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male and/or nonminority

employees for the same or similar conduct.  *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir.1999).  If the plaintiff sustains her burden of establishing a prima facie case, the burden then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for, in this case, plaintiff's suspension.  If the Agency successfully carries its burden, the burden returns to plaintiff to produce evidence from which a jury could find that the Agency's stated reason is merely pretextual.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The plaintiff may demonstrate pretext by showing that the Agency's articulated reasons "(1) had no basis in fact, (2) ... did not actually motivate [the adverse action taken against her], or (3) ... were insufficient to motivate [the adverse action taken against her]."  *E.g., Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (italics omitted).

Plaintiff has come forward with evidence demonstrating that the reasons given for plaintiff's suspension were false and a pretext for discrimination.  Plaintiff states the following in regard to the euthanized sheep:

> Similarly situated male employees who were treated better than Dr. Erbel relevant to the suspension are Tom Isham, Dr. Knowles, and Dr. Southall. Tom Isham is the experienced AHT who did the investigation and identified the sheep that was allegedly unnecessarily euthanized.  Dr. Knowles is the Epidemiologist responsible for verifying proper identification. Dr. Erbel called him from the farm with Tom Isham to explain the facts so he could make the final decision.  If the accusations are true then Dr. Knowles not only made the wrong decision, but he allowed the sheep to be euthanized before he verified the tags or the paperwork, which was his responsibility.  Likewise, if the sheep was incorrectly identified then Dr. Southall would have falsely certified on the government's indemnity claim form that the sheep was properly identified in order to pay indemnity.  Thus, if Dr. Erbel deserved to be suspended, then Dr. Dick should have disciplined each one of these men who played a similar or greater role than Dr. Erbel did in the demise of the

sheep and inaccurate reporting.

(citations to the record omitted). Moreover, plaintiff asserts that her actions were in fact proper in the incident involving the sheep. In regard to the other instances, plaintiff asserts that other similarly situated male employees were not excessively scrutinized and disciplined; that Dr. Southall actively sought out any of her alleged "misdeeds;" and that Dr. Southall contributed to the instances due to poor communication. Additionally, the plaintiff points out that the official was biased for the Agency and the official was not aware of the burden of proof to sustain the instances of alleged misconduct, which fundamentally indicates improper review of her "offenses." This evidence is sufficient to create a genuine issue of material fact as to whether the Agency suspended plaintiff on account of her gender.[8]

Again, claims based upon gender and disability are analyzed in similar fashion, but have some differences. In order to make a prima facie case of disability discrimination, plaintiff must show: (1) she is disabled within the meaning of the statute; (2) she is otherwise qualified to perform the essential functions of her job with or without accommodations; and (3) she suffered an adverse employment action due to her disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). The same burden shifting analysis as under Title VII gender discrimination claims is then applied.

---

[8]Some of plaintiff's facts and contentions in support of her gender discrimination claim may also be used to support disability discrimination.

In this instant case, plaintiff has presented evidence to establish that she suffers from adult ADHD and depression, which substantially limits one or more major life activities, that she was otherwise qualified to perform the essential function of her job with accommodation inasmuch as plaintiff had performed the job successfully for many years, and that she was subject to an adverse action, the suspension from her employment, as a result of her disability. Defendant contends that the plaintiff's subsequent disability indicates that she was not qualified to perform the essential functions of her position and that plaintiff's suspension was a result of misconduct and work errors. However, in careful consideration of the events, as discussed above, and the situation surrounding the suspension, the Court finds that there are disputed issues of material facts, which if resolved in plaintiff's favor, could support a jury verdict for plaintiff on these issues. Defendant's points of contention are open to question at this juncture in the proceedings. Accordingly, plaintiff's claim of wrongful suspension based upon discrimination must proceed to trial.

D.    Constructive discharge

The plaintiff alleges several forms of discrimination led to her constructive discharge. The Agency argues that the plaintiff did not exhaust her administrative remedies for any claim of constructive discharge and that constructive discharge is a discrete act, which must be the subject of a timely administrative complaint. The Agency cites to several

cases in support of its contentions, including *Ong v. Cleland*, 642 F.2d 316 (9th Cir. 1981).[9] The Ninth Circuit in *Ong* held that the plaintiff could not pursue a constructive discharge theory in court because she had failed to exhaust administrative remedies with regard to that claim: *Ong* had failed to allege constructive discharge in her administrative EEO complaint. *Ong*, 642 F.2d at 319-20. Thereafter, a Michigan district court, using the *Ong* decision for guidance, likewise found that the plaintiff did not exhaust all of her administrative remedies in that the plaintiff never used the term "constructive discharge" in any of her numerous EEO complaints and that the scope of the complaints did not encompass a constructive discharge claim. *Mitchell v. Runyon*, No. 94-CV-70084-DT, 1996 WL 633045, at *5-6 (E.D. Mich. Apr. 30, 1996).

The defendant also relies on several cases from the Eastern District of Tennessee, *Caras v. Potter*, No. 3:02-CV-662 (E.D. Tenn. Sept. 30, 2004), *Butler v. Potter*, 345 F.Supp.2d 844 (E.D. Tenn. 2004), and *Fisher v. Harvey*, No. 1-CV-102, 2006 WL 849868, at *5 (E.D. Tenn. Mar. 31, 2006). Counsel for the plaintiff urges this Court not to follow these decisions and asserts that she did advise of her constructive discharge during the investigation of her EEOC complaint such that the Agency had notice of her claim and opportunity to investigate.

---

[9]In *Ong*, the plaintiff sued under Title VII, alleging that she was discriminated against by her employer when she was denied a promotion. Before the administrative hearing on her EEO complaint, the plaintiff took a disability retirement. The plaintiff prevailed on the merits of her administrative complaint, but she received the retroactive promotion only until the date of her retirement. She subsequently filed a lawsuit in which she claimed that she was entitled to greater relief than that which was awarded to her administratively because her resignation was, in fact, a constructive discharge.

The Court adopts the analysis in the above cited decisions and finds them applicable to the facts of the case at bar.   Assuming that the plaintiff was constructively discharged, that event is a discrete act subject to the rigorous administrative exhaustion requirements and time limitations.  The United States Supreme Court in "*Morgan* has, on the whole, been understood to also bar discrete acts occurring after the time period, after the filing of an administrative complaint, when a plaintiff does not file a new complaint or amend the old complaint but instead presents these acts for the first time in federal court."  *Mullins v. Potter*, No. 04-72966, 2005 WL 3556198, at * 2 (E.D. Mich. Dec. 29, 2005) (citations omitted).  In the subject matter, the plaintiff resigned from employment and thereafter failed to amend her EEO claim or file a separate EEO complaint to add a constructive discharge claim.   The plaintiff did not raise the issue of constructive discharge in her two EEO affidavits submitted following her retirement.   The plaintiff's EEO complaint does not provide sufficient facts to show that they are reasonably related to the present constructive discharge action.  As Chief Judge Curtis L. Collier recently explained, dismissal of claims for failure to exhaust administrative remedies "may not seem reasonable, [but] it has been settled law for quite some time."  *Fisher*, 2006 WL 849868, at *5.  *See also Spencer v. Ashcroft*, 147 Fed. Appx. 373 (4th Cir. 2005); *Adams v. Potter*, No. 06-CV-14933, 2007 WL 1098539 (E.D.Mich. Apr. 11, 2007).  Accordingly, plaintiff's constructive discharge claim is dismissed.

       E.    <u>Retaliation</u>

"Federal courts do not have subject matter jurisdiction to hear Title VII claims unless

the claimant explicitly files the claim in an EEOC charge *or the claim can reasonably be expected to grow out of the EEOC charge*." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (emphasis added); *see Strouss v. Michigan Dept. of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). As a general matter, "retaliation claims based on conduct that occurs after the filing of the EEOC charge can be reasonably expected to grow out of the charge." *Strouss*, 250 F.3d at 342; *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833 (6th Cir. 1999) ("[R]etaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants."); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 54-47 (6th Cir. 1991). In fact, by requiring plaintiff to prove that she filed multiple EEOC charges--one alleging discrimination and another alleging subsequent retaliation--the district court would be improperly holding plaintiff to a higher standard than our precedent requires. *Sullivan v. Coca-Cola Bottling Co. of Ohio/Kentucky,* 182 Fed.Appx. 473, 480 (6th Cir. 2006); *Ganter v. Potter*, No. 3:03CV-644-S, 2007 WL 1031622, at * 5 (W.D.Ky. Mar. 28, 2007).

In the instant matter, the plaintiff alleges the following in her federal complaint:

> On February 14, 2002, Dr. Erbel contacted an Equal Opportunity Counselor with the Agency to report Dr. Southall's disparate treatment of her and the hostile environment based on her gender and disability. She also reported the Agency's refusal to provide her with a reasonable accommodation.... Dr. Southall continued to treat Dr. Erbel worse than her male colleagues, and *he began to retaliate against her for reporting the discriminatory treatment.*

(emphasis added).

The Court finds that the retaliation claim is based upon conduct that occurred after

contact was made to the EEOC and that the retaliation claim can reasonably be expected to grow out the EEOC charge regarding discrimination based upon gender and disability. Accordingly, the Court finds that the plaintiff's retaliation claim based on post -February 14, 2002, retaliation is not barred for failure to exhaust administrative remedies. However, in view of the federal complaint and the Court's inability to located any pre-2002 allegation of retaliation or any hostile environment resulting from exercise of a protected activity, any retaliation claim based on any alleged retaliation prior to Feb. 14, 2002 is time barred. *Abeita*, 159 F.3d at 254.

The Court next turns to whether the plaintiff has sufficiently presented a retaliation claim to survive summary judgment. Retaliation claims can occur in any number of situations. "The essence of such a claim is that the plaintiff engaged in conduct protected by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct. There are variations on this theme in bodies of statutory law that allow retaliation claims (e.g. ADA, Title VII, NLRA, etc.), but the essential framework remains the same." *Thaddeus-X v. Blatter*, 175 F.3d. 378, 386-87 (6th Cir. 1999). To establish a prima facie case of retaliation, the plaintiff must prove: 1) she engaged in protected activity; 2) the exercise of protected rights was known to the defendant; 3) that the defendant then took an adverse employment action against plaintiff or plaintiff was subject to severe and pervasive retaliatory harassment; and 4) a casual connection existed between the protected activity and the adverse employment action or retaliatory harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

The burden upon the plaintiff to establish a prima facie case of retaliation is minimal and easily met. *EEOC v. Avrey Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) (citing *Wrenn v. Gould*, 808 F2d 493, 500 (6th Cir.1987)). Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Morris*, 201 F.3d at 792-93. If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision. *Id.*

Element one is undisputed. As to element two, the Court finds that the plaintiff has presented sufficient proof of knowledge. While causes of action are evaluated on a case-by-case basis, knowledge is typically a question to be resolved by a trier of fact. *Anderson v. City of Bessmer*, 470 U.S. 574, 577 (1985); *Crutcher v. Commonwealth of Kentucky*, 883 F.2d 502, 504 (6th Cir. 1989); *Mulhall v. Ashcroft*, 287 F.3d 543, 551-54 (6th Cir. 2002) (an inference of knowledge may be drawn from circumstantial evidence).

The third and fourth elements of retaliatory harassment are contested. The third element of a retaliatory harassment claim may be satisfied by proof that plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor. *Akers v. Alvey*, 338 F.3d 491, 497 (6th Cir. 2003); *Morris*, 201 F.3d at 792 . Although discussed above, the Court will reiterate that to establish "severe or pervasive" harassment, the plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Akers*, 338 F.3d at 498 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The "severe or pervasive" test

has both an objective and a subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive. *Akers*, 338 F.3d at 498. Although the defendant argues that the conduct of which plaintiff complains was not severe or pervasive sufficient to constitute harassment under the law, the Court must view the facts favorably for the plaintiff. The Court finds that plaintiff's testimony and evidence show that she subjectively regarded the environment as hostile or abusive. Further, the Court declines to conclude as a matter of law that the conduct complained of was not objectively severe or pervasive.

As to the fourth element, defendant argues that there is no causal connection between the events and the plaintiff's protected activities. To establish a causal connection, a plaintiff must provide evidence to raise a sufficient inference that the protected activity was the likely reason for the adverse employment action. *Avery Dennison*, 104 F.3d at 861. The Court considers that the Sixth Circuit has, in certain circumstances, found that temporal proximity between the protected activity and the hostile work environment may give rise to an inference of a causal connection. *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (holding that temporal proximity alone (21 days) is sufficient to establish an inference of retaliation); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that temporal proximity alone (3 months) is sufficient to establish an inference of retaliation). The Court, however, notes the recent decision in *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321(6th Cir. 2007), which states that "[t]he law is clear that

33

temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." While the Court finds that the temporal proximity showing in the instant matter is strong, the Court also considers the evidence of plaintiff's satisfactory work history, the facts that plaintiff was subjected to excessive scrutiny and disciplined for trivial matters, i.e. treated differently from other employees who did not engage in protected activity. This evidence is sufficient to support a prima facie case and also sufficient to evince pretext. Accordingly, summary judgment for the retaliation claim for participating in protected activities is not appropriate.

### IV. <u>Conclusion</u>

For the reasons hereinabove set forth, defendant's motion for summary judgment [Doc. 11] is **GRANTED in part and DENIED in part.** Defendant's motion for summary judgment as to plaintiff's claims regarding failure to accommodate and constructive discharge are **GRANTED**; however, defendant's motion for summary judgment as to claims regarding hostile work environment, suspension, and retaliation are **DENIED**, as set forth above. The parties shall prepare this matter for trial on the remaining claims.

**IT IS SO ORDERED.**

      **ENTER:**

      s/Thomas W. Phillips_____
      UNITED STATES DISTRICT JUDGE