**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

DR. COLLEEN ERBEL,                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        No.  3:04-CV-555
                                      )        (Phillips)
MICHAEL O. JOHANNS, SECRETARY         )
UNITED STATES DEPARTMENT OF           )
AGRICULTURE,                          )
                                      )
        Defendant.                    )

<u>**MEMORANDUM OPINION**</u>

        Dr. Colleen Erbel sued her former employer, the United States Department

of Agriculture (USDA), for employment discrimination in violation of the Rehabilitation Act

and Title VII.  The case was tried to a jury over a seven-day period and resulted in a jury

verdict in favor of Dr. Erbel.  The USDA now moves the court for judgment in its favor as

a matter of law, pursuant to Rule 50(b), or, in the alternative, for a new trial, pursuant to

Rule 59(a), Federal Rules of Civil Procedure.

        As grounds for the motion, the USDA states that: (1) the trial record is devoid

of legally sufficient evidence that Dr. Erbel was disabled under the law; (2) the trial record

is devoid of legally sufficient evidence that non-disabled or male employees who were

similarly situated to Dr. Erbel were treated more favorably than Dr. Erbel; (3) the record establishes that all actions taken by Dr. Erbel's supervisors were taken for legitimate, non-discriminatory reasons, and there is no evidence of pretext; and (4) the damages award is excessive.

The USDA also moves the court for oral argument on these post-trial motions. The USDA and the plaintiff received permission from the court to exceed the twenty-five page limitation for briefs, and each side has thoroughly addressed the relevant issues. Oral argument is unnecessary given the extensive written briefing submitted by the parties. Therefore, the USDA's motion for oral argument [Doc. 168] is **DENIED.**

## Judgment as a Matter of Law/New Trial Motion

A motion for judgment as a matter of law should be granted if in "viewing the evidence in the light most favorable to the non-moving party, there is no  genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir. 2004). That is, the court must determine whether there is evidence which would properly support a jury verdict in favor of the non-movant. *Patrick v. South Central Bell. Tel. Co.,* 641 F.2d 1192, 1197 (6th Cir. 1980). In making this determination, the court must view the evidence in the light most favorable to the non-movant and may neither weigh the evidence, pass on the credibility of witnesses, nor substitute its own judgment for that of the jury. *Morelock v. NCR Corp.,* 584 F.2d 1096, 1104 (6th Cir. 1978). The court must give the non-moving party the benefit of all reasonable inferences. *Hunt v. Coynes Cylinder Co.,* 956 F.2d 1319, 1328

2

(6th Cir. 1992). Further, the motion should be granted only where there is "a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ. *Tuck v. HCA Health Services of Tennessee, Inc.,* 7 F.3d 465, 469 (6th Cir. 1993).

Under Federal Rule of Civil Procedure 59(a), a court may set aside a jury verdict and grant a new trial "to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Courts have generally interpreted this language to allow a new trial when a jury has reached a "seriously erroneous result," which may occur when (1) the verdict is against the weight of the evidence; (2) the damages awarded are excessive; or (3) the trial was unfair to the moving party in some fashion (i.e., the proceedings were influenced by prejudice or bias). *See Holmes v. City of Massillon,* 78 F.3d 1041, 1045-46 (6th Cir. 1996). The burden of demonstrating the necessity of a new trial is on the moving party, *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.,* 925 F.2d 993, 1002 (6th Cir. 1991), and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *See Anchor v. O'Toole,* 94 F.3d 1014, 1021 (6th Cir. 1996); *Davis v. Jellico Community Hosp., Inc.,* 912 F.2d 129, 133 (6th Cir. 1990) (limiting a court's responsibility to preventing an injustice); *Browne v. Signal Mountain Nursery,* 286 F.Supp.2d 904, 908 (E.D.Tenn. 2003).

When ruling on a new trial motion claiming the verdict was against the weight of the evidence, the district court should "compare the opposing proofs and weigh the evidence." *Conte v. Gen. Housewares Corp.,* 215 F.3d 628, 637 (6th Cir. 2000); *Toth v. Yoder Co.,* 749 F.2d 1190, 1197 (6th Cir. 1984); *see also J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 (6th Cir. 1991). The court should deny the motion and leave the jury's verdict undisturbed so long as it "could reasonably have been reached." *See Conte,* 215 F.3d at 637-38. Thus, a motion for a new trial should be denied "if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Mosley v. Kelly,* 65 F.Supp.2d 725, 739 (E.D. Tenn. 1999), quoting *Powers v. Bayliner Marine Corp.,* 83 F.3d 789, 796 (6th Cir. 1996). A jury's verdict "should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *J.C. Wyckoff,* 936 F.2d at 1487. Rather, the court must compare the offered evidence and set aside the jury's verdict only if it is against the clear weight of the evidence as a whole. *Webster v. Edward D. Jones & Co.,* 197 F.3d 815, 818 (6th Cir. 1999).

When reviewing the facts of a discrimination claim after there has been a full trial on the merits, the court must focus on the ultimate question of discrimination rather than on whether a plaintiff made out a prima facie case. *Barnes v. City of Cincinnati,* 401 F.3d 729, 736 (6th Cir. 2005). Thus, the proper inquiry following the presentation of all evidence in a Title VII case is whether the plaintiff has proven her case by a preponderance of the evidence. *Id.*

Under Title VII, in order to prevail on a hostile work environment claim based on gender, Dr. Erbel had to show by a preponderance of the evidence that (1) she was a member of a protected class; (2) she was subjected to harassment based on her gender; (3) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offense work environment; and (4) the USDA failed to take reasonable care to prevent and correct any such harassment. *Bowman v. Shawnee State Univ.* 220 F.3d 456, 463 (6th Cir. 2000).

The elements of a hostile environment claim based on gender and a hostile environment claim based on disability are similar, but not exactly the same. Under the Rehabilitation Act, Dr. Erbel was required to demonstrate that (1) she was disabled; (2) she was subjected to harassment, based solely on her disability; (3) the harassment unreasonably interfered with her work performance; and (4) the USDA either knew or should have known about the harassment and failed to take corrective measures. *See Blankenship v. Parke Care Ctrs. Inc.,* 123 F.3d 868, 872 (6th Cir. 1997) (establishing the framework of proof under Title VII for sexual harassment); *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 834 (6th Cir. 1996) (holding that the elements of a hostile work environment claim are the same across discrimination contexts.).

<u>Evidence of Disability</u>

The determination of whether a person is disabled within the meaning of the Rehabilitation Act is an individualized inquiry, particular to the facts of each case. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999). In examining such claims, the Sixth

Circuit has adopted the standards provided by the Americans with Disabilities Act (ADA) and its corresponding EEOC regulations. *Burns v. City of Columbus Dept of Pub. Safety,* 91 F.3d 836, 842 (6th Cir. 1996). Under the ADA, a disability is defined as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) having a record of such an impairment, or (3) being regarded as having such an impairment. 42 U.S.C. §12102(2).

The focus of the inquiry here is whether Dr. Erbel presented sufficient evidence that her impairments "substantially limited" her ability to perform at least one "major life activity." Relevant EEOC regulations pertaining to the ADA state that "major life activities" are functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(l). The "ability to perform cognitive functions on the level of an average person" constitutes a major life activity. *Brown v. Lester E. Cox Med. Ctrs,* 286 F. 3d 1040, 1045 (8th Cir. 2002). Accordingly, thinking and concentrating qualify as "major life activities" under the ADA. *See Shaver v. Indep. Stave Co.,* 350 F.3d 716, 720-21 (8th Cir. 2003); *Head v. Glacier Northwest Inc.,* 413 F.3d 1053, 1061 (9th Cir. 2005); *Fiscus v. Wal-Mart Stores, Inc.,* 385 F.3d 378, 383 (3rd Cir. 2004); *Nawrot v. CPC Int'l,* 277 F.3d 896, 907 (7th Cir. 2002).

The record shows that Dr. Erbel suffers from two chronic mental impairments: major depression and attention deficit hyperactivity disorder (ADHD). Throughout most of 2002, Dr. Erbel also suffered from generalized anxiety disorder. However, the determination of whether an individual has a disability is not necessarily based on the

diagnosis of an impairment, but rather on the effect of that impairment on the life of the individual. 29 C.F.R. pt. 1630, App. § 1630.2(j).

There is record support for the jury's finding that Dr. Erbel is disabled under the Rehabilitation Act. At trial, Dr. Joanne Filchock, Dr. Erbel's family practice physician testified that Dr. Erbel reported having severe stress at work, that she was feeling harassed and her blood pressure became more and more out of control. Dr. Erbel also reported having chest pains caused by stress. Based on these medical impairments, Dr. Filchock felt that it was medically necessary to keep Dr. Erbel from going out of town on a 30-day detail assignment. Dr. Filchock opined that Dr. Erbel's work environment and work-related stress aggravated her health and hypertension.

Dr. Lane Cook, plaintiff's psychiatrist testified that at the time of the events alleged in the complaint, Dr. Erbel suffered from Major Depression, Recurrent, and Attention Deficit Hyperactivity Disorder (ADHD). As to the effect of Dr. Erbel's disorders on her daily life, Dr. Cook testified that her symptoms substantially impaired her cognitive functioning and working memory. These impairments also substantially impacted her ability to organize, concentrate, think, and plan. In addition, Dr. Cook testified that her symptoms substantially impaired her ability to care for herself and perform daily life activities. Comparing Dr. Erbel to an average person in the general population who does not have these disorders, Dr. Cook opined that she is substantially limited in her ability to perform major life activities.

Dr. Cook further testified that even with medication and treatment, Dr. Erbel still suffered substantial impairment in her daily life activities. Dr. Cook stated that she suffered increasing symptoms of depression because she was treated unfairly at work, and that the aggravation of her depression impacted her ability to manage her ADHD. In 2002, he also began treating Dr. Erbel for anxiety caused by the stress or friction in her workplace. Dr. Cook testified that Dr. Erbel's work was a harmful environment for her and detrimental to her mental health. He supported her request for disability retirement finding that she was unable to do the work anymore.

Dr. Cook further testified that Dr. Erbel suffered from a mental or emotional injury in addition to her disorders and that the cause of the injury was her treatment at her place of employment. He described several things that happened which demoralized her: she had been told that she would have more frequent feedback, monthly meetings with her supervisor, which didn't occur; she kept hearing rumors that she was being talked about behind her back; she was supposed to be given more information about her performance and then was blind-sided by an unsatisfactory performance evaluation; she was asking for more help and instead help was taken away from her; she was asked to go on a detail out of rotation that she felt was uncalled for and unfair. It made her feel more hopeless and helpless, more confused. She would attempt to get more clarification and could not get that. Dr. Cook further testified that it impacted Dr. Erbel's morale, her ability to plan, it impacted her optimism: "She became more despondent. She had thoughts that life wasn't worth living, thought about killing herself. It made her question her, you know, her own validity and self-worth." Dr. Cook opined that the injury suffered as a result of her work

environment significantly aggravated the actual mental disorders: "And then, over time, especially as she reports the events at work to me, she's more tearful, she is frequently suicidal, she is having more struggles with just at times getting out of bed, bathing, brushing her teeth, paying bills. She misses a couple of appointments with me, is more disorganized, loses her keys, loses her phone, not cashing checks people sent to her. You know, just basically what we call poor task completion, not finishing things, going off on tangents, in some cases, not even getting started on things."

Dr. Denise Tope, plaintiff's clinical psychologist, testified that Dr. Erbel's symptoms worsened significantly in 2001, but especially in 2002 because of the difficult situation in the workplace. Dr. Tope categorized the problems Dr. Erbel experienced with ADHD as cognitive difficulties, *i.e.,* the ability to focus and concentrate. Dr. Erbel also experienced trouble maintaining persistence on task and significant difficulties in organizing herself:

> Her organizational skills had deteriorated to the point where she reported stacks of papers in her office area. She had reported the need to store a lot of her test supplies for animal testing, and sometimes would spend an inordinate amount of time even looking for a particular test that she needed.
>
> She reported difficulties in structuring her days. She was required by her job to structure her own days and this became increasingly difficult for Colleen. She reported difficulties in concentrating and she was reporting at that time less involvement in nonwork activity. So, for example, she was spending less time with her horse. She was spending less time socializing with friends. And she was becoming more withdrawn. . . .

Dr. Tope also testified that Dr. Erbel began having difficulty in basic self-care activities, "Not so much personal hygiene cleanliness, but cleanliness of her home and she was very invested in caring for her pets or animals, but that became difficult during that time." Dr. Tope noted that before this time Dr. Erbel had been a regular exerciser, she would jog, and that became difficult for her to do. Dr. Tope described the counseling process as a three-way cycle, the depression, the ADHD and job stress, as that cycle continued and spiraled upwards, Dr. Erbel's distress became significant and Dr. Tope was very concerned about her emotional well-being. Dr. Tope suggested that Dr. Erbel take a leave of absence from work in the spring of 2002 because her distress was so great that she was having difficulty functioning. She wasn't sleeping, she became fearful to go to work, and fearful about her job and the way she was being perceived. Dr. Tope believed that giving her some time away from work would allow her to recover emotionally. After a 10-day absence, Dr. Erbel's mental health improved somewhat, but the improvement did not last long because Dr. Erbel experienced increasing difficulties at work, she was reprimanded for various things and her distress escalated. Dr. Tope also found that Dr. Erbel suffered a mental or emotional injury at work separate from her disorders. Dr. Tope testified that this work injury was severe.

While the USDA claims that this evidence established only that Dr. Erbel has a moderate limitation in her cognitive abilities, the testimony of Drs. Filchock, Cook, and Tope sufficiently support the jury's finding that Dr. Erbel is disabled within the meaning of the Rehabilitation Act.

Evidence of Disparate Treatment of Male and Non-Disabled Employees

To prevail on her claim of disparate treatment, Dr. Erbel had to prove that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was treated differently than similarly situated male or non-disabled employees for the same or similar conduct

Here, the jury heard evidence from which they could reasonably conclude that Dr. Erbel was treated differently from similarly situated male or non-disabled employees: At trial, Dr. Erbel was asked if she had experienced comments or treatment that she believed to be discriminatory. She recalled an incident where Dr. Knowles disagreed with her approach to something, and when she talked to him about it, he said that he didn't know if she had a mental problem or it was her time of the month. She found that offensive, unfair and judgmental. She reported that when she would offer an opinion, it would generally be very quickly dismissed, but if a man expressed an opinion, everyone would say "okay, yeah, let's see if that will work." When she wanted to present an idea to Dr. Southall, she asked Tom Isham to present it, because he would get a much better reception, the idea wouldn't just immediately be rejected. Dr. Erbel further testified that Dr. Southall would give Isham feedback about things that needed to be done, but Dr. Southall would not give her the same feedback.

Dr. Erbel further testified that when Dr. Southall arrived, she noticed that some individuals didn't treat her as politely as they used to, especially Larry Curlee. In a group, Curlee would be very polite, almost deferential to the male veterinarians, and with

her, he would try to be her supervisor, telling her what to do, what she was doing wrong or things like that. At some point in time, Dr. Erbel testified she was pretty much told not to come into the office anymore. In addition, she worked for a whole year without any animal health technician, where she had previously had two assigned to her. She received an e-mail from Dr. Southall stating that even though she was working without a technician, that she should have been able to complete more work.

Dr. Erbel next testified that she heard through a veterinarian in Kentucky, Mike Pavlic, that Dr. Southall was trying to get her fired. She learned that there were individuals in the office who were complaining about her work performance. When she approached Dr. Southall about her performance, he told her he didn't have any problems, and maybe it was Dr. Knowles who was complaining. Dr. Erbel also heard from Dr. Matt Welborne, a UT professor that she was being transferred to Michigan. When she asked who had told him this, Dr. Welborne reported that Dr. Southall had told him that.

Laura Hicks, Dr. Southall's assistant, stated in her EEO affidavit that, "In March 2002, soon after I began, Dr. Southall asked me to keep track of documents Dr. Erbel submitted. I maintained a spreadsheet with due dates and dates received. Initially, I was told to only track Colleen's paperwork. I said this was wrong and we needed to do it for everyone." At trial, Hicks testified that Dr. Southall asked her if she had any problems with Dr. Erbel, or had received any complaints about her. She told him that Dr. Erbel was occasionally late on sending in reports and time sheets. She further testified that Dr. Southall did not ask her if she was having problems with anyone else. Every pay period

Dr. Southall would ask her to review all Dr. Erbel's leave documents, time sheets, and doctors' slips. Then he would draft a letter for Hicks to type. Hicks did not type letters regarding other employees on their leave requests other than Dr. Erbel.

Hicks further testified that Dr. Southall's demeanor towards Dr. Erbel was very detailed, he would check every detail, make sure everything was right. But Dr. Southall did not apply the same scrutiny to others' leave requests. Hicks stated that Dr. Erbel was not informed when she was not living up to Dr. Southall's expectations. Dr. Erbel was unaware that Dr. Southall was marking her AWOL or not giving her credit for some of her leave. At times was she not paid because she did not provide proper documentation for sick leave. Other VMO's leave slips were approved regardless of whether they had a doctor's signature on them, which was required of Dr. Erbel. Hicks further testified that in her interactions with Dr. Erbel it appeared that Dr. Erbel was trying to do what Dr. Southall expected of her. She felt that Dr. Erbel was an honest person. After Dr. Southall left, Dr. Erbel's leave slips were scrutinized by the Regional office, and some of her leave slips that had previously not been approved by Dr. Southall were approved.

Tammy Watkins worked in the USDA Nashville office and was Dr. Southall's administrative supervisory assistant. She testified that Dr. Erbel was very easy to get along with. She rarely had any problems collecting the reports or the paperwork that were needed on Dr. Erbel's vehicles and her work reports were always in on time. Her reports were well-written, her reports contained a lot of information. It showed that there was a lot of work being done in her area. Dr. Erbel never caused the staff any unnecessary extra

work with either being late or with not providing information.    Neither she nor her staff had any complaints about Dr. Erbel.  However, Dr. Riggins was consistently late or never got reports in.  There were occasions when she would have to completely fill out his travel vouchers for him, which was something that he was supposed to do himself.   These problems were reported to Dr. Southall, but Dr. Southall never did anything about it.  He just overlooked the fact that Dr. Riggins was not computer literate, and he was just biding his time because he was an older gentleman.  He just accepted everything the way it was.  He never forced Dr. Riggins to make changes, he never forced him to learn the computer.  On the other hand, Dr. Southall was very hostile toward Dr. Erbel.  He wasn't happy with her performance.  In Watkin's opinion Dr. Erbel's work was always very well-reported.  No one was complaining in her area.

            Watkins further testified that Dr. Southall was very degrading of women.  Dr. Southall told her that Dr. Erbel was depressed and he left like that was the reason that her work was slacking.  She stated that Dr. Southall was being more demanding of things he expected from Dr. Erbel.  Although her work reports showed work was being done, he kept insisting that no work was being done and he wanted more.  He always said that he wanted more work being shown.  Her vehicle reports were always current, and he always tended to somehow tell her that they were not current, even though date-stamped, you could see that they were.  Travel reports were in, so you could see that she had been traveling to the various places that she needed to be, so you know that she was out doing what she was supposed to be doing.  So there wasn't any room for argument, according to the reports that she was turning in, but he still said that she was not doing her job.

14

Dr. John Hollis, a veterinary medical officer for the USDA testified as to a conversation about Dr. Erbel which occurred with Dr. Southall, Dr. Harden, Dr. Barton, Dr. Knowles and Dr. John Anderson during lunch one day. He described the conversation as definitely derogatory in nature. There was discussion about her job performance which he felt was very negative and inappropriate, considering that her supervisors were discussing Dr. Erbel with people outside the office. Dr. Southall expressed that he wasn't happy with Dr. Erbel and her situation. Dr. Hollis found the conversation offensive because he had trained with Dr. Erbel. As far as he knew, she was a good employee, who hadn't had any disciplinary action taken against her previously. He later reported the conversation to Dr. Erbel.

Regarding the 30-day detail to New Jersey, Dr. Southall testified that after he notified Dr. Erbel that she would be sent to New Jersey, she informed him that she was struggling with ADHD and depression and wanted a medical option out. Dr. Erbel was given a deadline to submit medical information and the detail assignment was postponed awaiting medical documentation. Dr. Erbel provided the requested information from her treating physicians, Dr. Cook and Dr. Filchock. It was approximately one week later, on February 21, that Dr. Southall restricted her sick leave, although she had not taken more sick leave than what she was entitled to. After receipt of Dr. Erbel's medical information, Dr. Southall told Dr. Erbel that she was still scheduled to go on the detail assignment.

Dr. Erbel testified that it was not her turn to go on a detail because she had been on a  30-day detail more recently than other people had, particularly, Dr. Woodson,

who had not been on a detail since the early '90's.  She also knew that Dr. Riggins had not been on a 30-day detail in a very long time.  Dr. Knowles also testified that Dr. Woodson did not go on a detail assignment or travel from 1997 until he retired.

Regarding the letter of reprimand for cell phone misuse, Dr. Erbel testified that she felt there was a miscommunication between herself and Dr. Southall.  She stated that Dr. Southall had indicated that it was okay to use the phone as long as she didn't exceed the minutes.  When she was in the process of moving and staying in temporary housing, Dr. Southall told her to use the government phone, rather than having a phone installed.  However, in July, Dr. Southall told her she was going to be getting a letter about cell phone charges.  He told her to indicate that all calls were business calls.  Dr. Erbel offered to pay for her personal calls and did repay the USDA.  She testified that if Dr. Southall had just told her there was a problem, she could have corrected it much earlier.

Dr. Southall testified that when he gave Dr. Erbel a letter of reprimand in January she confided in him that she had been diagnosed with ADHD.  Dr. Erbel also asked for better communication about her work performance, and requested a performance improvement plan.  He passed on this information to the Regional office.  He attempted to provide some structure to her work, by giving Dr. Erbel deadlines to help her accomplish what needed to be done, but he never implemented a performance  improvement plan.

At a mediation between himself, Barbara Marx and Dr. Erbel, the parties agreed that Dr. Southall and Dr. Erbel would meet once a month to discuss  procedures,

performance and any disciplinary issues.  Dr. Southall admitted he met with Dr. Erbel only once or twice after the mediation.  He did not communicate any concerns about Dr. Erbel's work performance before the end of 2001.

As to her performance appraisal for the year 2001, Dr. Southall testified that he rated Dr. Erbel as "does not meet fully successful" under "Administrative Duties," and she received an overall rating as "marginal," which was less than fully successful.  Although Dr. Erbel was not rated fully successful, she was not placed on a performance improvement plan because Dr. Southall considered it to be a misconduct issue.  Dr. Southall, Dr. Dick and Margaret Brasfield as a group, decided to treat Dr. Erbel's situation as a misconduct case and headed down a road of progressive discipline with her.  Dr. Southall also testified that he had heard a rumor in the office that Dr. Erbel had filed an EEO complaint, although he later acknowledged that she never filed a complaint against him.

Dr. Erbel testified that Dr. Southall told her that he had absolutely no responsibility to help her be successful or to meet his performance expectations.  He would not meet with her on a monthly basis because he was too busy with the Miami Import Center.  He also told her that he would never again meet with her without someone else there, because he was afraid that she would falsely charge him with inappropriate behavior. Dr. Southall told her that he had asked Tom Isham to document things that she had done wrong and that Tom had refused, saying that he was afraid that Dr. Erbel would retaliate against him.  Dr. Erbel testified at that point, she believed that she was being singled out,

treated worse than her male colleagues. She recalled the times that her male co-workers were treated with respect and deference and she wasn't. She thought that if she could get the support she felt that her male colleagues were getting, she would be able to return to work and be successful. She further testified that her requests for clerical assistance were denied. She asked that the leave restriction policy be lifted and the request was refused. She asked to spend more time in that Nashville office so she would be better informed about procedures, but that request was also denied.

Prior to her February performance evaluation, Dr. Southall testified that Dr. Erbel sent him an e-mail requesting an agenda of the topics that would be discussed and the persons to be present. At the recommendation of the Regional Office, Dr. Southall did not respond to her requests, although he advised Dr. Erbel a week or two before that he was going to rate her "marginal." He further testified that when Dr. Erbel arrived at the performance appraisal meeting she seemed caught off guard that Margaret Brasfield was there. He not told her that Margaret Brasfield would be present. At this meeting, Dr. Southall had a stack of papers, presumably supporting documentation for the rating. He never showed Dr. Erbel any of the documentation or asked her for any explanation prior to the meeting. During the performance appraisal meeting he told Dr. Erbel he was going to remove Tom Isham from under her supervision. He did not mention any concerns to her at the meeting about her sick leave use.

Dr. Erbel testified that she was not aware of any other employee who was under a leave restriction. Further, Dr. Knowles and Dr. Riggins were provided with clerical

18

assistance and she was not. In her performance appraisal in February 2002, Dr. Southall told her that he had no intention of assisting her and that he had fired people before and that if she didn't perform up to his expectations, then he could fire her. She felt that she was going to be terminated. She felt that she was being questioned about every little thing she did, which was demeaning and humiliating. She also felt that other people in the office knew more about her situation than she did. The constant requests from Dr. Southall to explain her actions interfered with her ability to get the work done because she spent a lot of time responding to his inquires. She testified that she found it paralyzing, because it got to the point where anything she did, she tried to think through all the possibilities that she might be criticized on, it made the work difficult. As a result, her depression increased as did her anxiety.

Margaret Brasfield, Human Relations Specialist with the Regional office of the USDA, testified about a situation with another VMO, Dr. Larry Shipman, who was placed on a performance improvement plan after being give a letter of reprimand for misconduct. One of the terms of the plan was that Dr. Shipman was entitled to have weekly meetings with his supervisor. Dr. Shipman improved his performance sufficiently to remain with the USDA. However, Dr. Erbel was not offered a performance improvement plan.

Based on the evidence above, the jury could reasonably find that Dr. Erbel was treated differently from other employees based on her gender or disability.

<u>Evidence of Pretext</u>

The USDA maintains that it had legitimate, non-discriminatory reasons for the employment actions taken in regard to Dr. Erbel: failure to inspect the Wilson Market; the Kingsport Expo problems; late report on the scrapie trace; poor investigation that led to the unnecessary euthanization of the Jeffers ewe. Although a rational trier of fact might believe these explanations, there is sufficient contrary evidence to support the conclusion that the stated reasons were a pretext designed to hide discrimination. Dr. Erbel can refute the legitimate, non-discriminatory reasons offered by the USDA by showing that the USDA's stated reasons (1) had no basis in fact, (2) did not actually motivate the adverse action, or (3) were insufficient to motivate the adverse action. *Singfield v. Arkron Metro. Hous. Auth.,* 389 F.3d 555, 564 (6th cir. 2004).

Dr. Southall testified that on March 26th he issued the proposal to suspend Dr. Erbel for failure to follow instructions. The proposal was based on three issues: failure to inspect the Wilson Livestock Market as directed by him; reports that she was unprepared for a scrapie presentation at the Kingsport Farmer's Market; and the euthanization of the Jeffers ewe. He never discussed these issues with Dr. Erbel prior to proposing her suspension. He specifically did not ask Dr. Erbel or Tom Isham about the investigation that they did concerning the scrapie trace before deciding to suspended Dr. Erbel. He admitted that out of approximately 60 head of sheep in this particular trace, Dr. Erbel had 45, while four or five vets shared the other 15. He had given Dr. Erbel a 60-day deadline to trace the 45 sheep assigned to her. The other vets involved in the trace did not receive a deadline.

Regarding the decision to euthanize the Jeffers ewe, Tom Isham, an animal health technician, who worked with Dr. Erbel testified that if Dr. Erbel was wrong in her decision to euthanize the Jeffers ewe, then he and Dr. Knowles were equally wrong. Yet, neither Isham nor Dr. Knowles were disciplined for their role in the decision. Isham further testified that in his 35 years working for the USDA, he could not recall anyone else being suspended over a judgment call regarding a scrapie trace.

Dr. Allen Knowles, an epidemiologist who also worked under Dr. Southall testified that if the owners of the ewe told Tom Isham and Dr. Erbel that the ewe was born on the Gentry Farm during the time period, then it would have been appropriate to euthanize the animal. Further, based on their report, he agreed with them and authorized the euthanization of the ewe. He further testified that it was his responsibility to make sure that any animal brought in for euthanization was properly identified. Dr. Southall never counseled or reprimanded him in any way for his role in the decision-making that resulted in the euthanization of the Jeffers ewe.

As for Dr. Erbel's presentation at the Kingsport Expo, Isham testified that there was nothing unusual about the presentation that Dr. Erbel gave. Nor did she give out any misinformation. The presentation started and ended on time.

On April 9, 2002, Dr. Southall testified he wrote a memo to Dr. Erbel asking her why she incurred overtime in order to investigate a foreign animal disease call. Dr. Erbel wrote a letter in reply explaining why she worked overtime, and requested that in the

future Dr. Southall consider calling her about his concerns rather than sending a letter. Dr. Erbel further stated that she spent so much time responding in writing to Dr. Southall's memos that it was becoming more and more difficult to concentrate on and complete field work.

On April 17, 2002, Dr. Southall sent an e-mail to Margaret Brasfield about Dr. Erbel's time and attendance. He did not inform Dr. Erbel that he had questions about her time and attendance. He wrote in the e-mail to Margaret Brasfield, "We now are not sure how to proceed. To a point, you may have someone falsifying her T&A, yet I am not sure how solid that is." He was accusing Dr. Erbel of falsifying her time and attendance records.

Dr. Southall next testified that on May 13, 2002 he sent a memo to Dr. Dick and Ms. Brasfield concerning the foreign animal disease investigation; on May 15, he sent a memo to Dr. Dick and Ms. Brasfield regarding Dr. Erbel's weekly activity reports; on May 30, he sent another memo to Dr. Dick and Ms. Brasfield regarding some additional concerns he had about another foreign animal disease investigation; again on May 30, he sent another memo to the Regional office concerning questions about Dr. Erbel's leave. Dr. Southall began marking Dr. Erbel absent without leave when Dr. Erbel failed to have her doctor actually sign the doctor's note she turned in pursuant to the leave restriction letter. June 13, another memo to the Regional office marking Dr. Erbel absent without leave. June 17, again marking her absent without leave because she sent her leave in on a FAX that was unreadable. June 21, another memo to Dr. Dick and Ms. Brasfield about Dr. Erbel and her leave slips. June 25, a memo to the Regional office expressing concerns

about Dr. Erbel's time management.  July 9, a memo to the Regional office concerning questions about whether or not Dr. Erbel was using the proper form.  July 10, memo to the Regional office because Dr. Erbel turned in something on plain paper, but it was not on the form he wanted it to be.  July 10, another memo to the Regional office about Dr. Erbel submitting a receipt for steel-toed boots a few days late.  July 10, a third memo marking Dr. Erbel AWOL again.  July 18, a memo to the Regional office that Dr. Erbel was on annual leave when the state vet wanted some assistance.  Dr. Southall further testified that Dr. Dick and Margaret Brasfield told him to document all these incidents with Dr. Erbel, but not to tell her about them.

Dr. Southall next testified that he received a letter from Dr. Erbel dated  June 27, 2002, in which she asked for help in figuring out which days she was being marked AWOL and asking why she was being marked AWOL.  He refused her request for assistance.

Regarding Dr. Erbel's situation, Brasfield testified that there was no follow-up to get an explanation from Dr. Erbel or to investigate Dr. Southall's accusations against her, although the Employee Handbook stated, "It is important to give an employee an opportunity to explain and to document the employee's explanation.  Supervisors should not merely document employee's misconduct or misdeeds without counseling the employee about the need to correct the behavior."  Brasfield testified this was not done prior to the Agency's decision to suspend Dr. Erbel.

After Dr. Southall left the Tennessee Regional office, Dr. Knowles replaced him as AVIC. He stated that he signed a letter to Dr. Erbel in October 2002, denying certain requests for assistance that she had asked for. He further stated that if the Regional office had been supportive, he would have worked with her on some of her requests.

Dr. Jere Dick, Assistant Regional Director for the USDA, testified that he was involved at the Regional office with the decisions concerning Dr. Erbel. He stated that Tom Isham disputed everything that Dr. Southall accused Dr. Erbel of, and Isham did not support the suspension of Dr. Erbel. Further, when he made the final decision to suspend Dr. Erbel, he did not discuss it with her. He had no idea what her side of the story was on any of the documentation that Dr. Southall was sending to the Regional office.

Based on the above evidence, the jury could reasonably find that the USDA's actions taken against Dr. Erbel were not for legitimate business reasons, but were a pretext for gender and/or disability discrimination.

The USDA also argues that a new trial is warranted pursuant to Rule 59 because the plaintiff intentionally placed evidence before the jury about her alleged constructive discharge and requests for accommodation which confused the jury and improperly prejudiced the USDA and resulted in an unfair verdict.

Contrary to the USDA's argument, evidence that Dr. Erbel no longer worked for the agency was relevant and admissible to establish her hostile environment claim, her disability discrimination claim, and her claim for emotional distress damages. The fact that Dr. Erbel could no longer work in the agency environment showed that she subjectively found it to be offensive, which was an element of her hostile environment claim. Additionally, evidence that the hostile environment exacerbated the symptoms of her impairments was relevant to support her disability discrimination claim. Finally, evidence that the hostile environment forced her to retire from her career was relevant to support her emotional distress claim, both as to causation and as to the extent of her injury.

Similarly, evidence regarding accommodation or assistance was probative of Dr. Erbel's disability and gender disparate treatment claims to show that the USDA provided assistance or accommodation to similarly situated employees outside the protected class. For example, when Dr. Erbel was ordered to go to New Jersey for 30 days, she produced evidence that it was not her turn to go. Therefore, her request for exemption was a request that her supervisor treat her equally with similarly situated employees. The USDA's refusal to provide Dr. Erbel with a performance improvement plan, contrary to agency policy, and contrary to its treatment of other non-protected employees, was relevant to the issues of gender and disability discrimination.

Finally, the jury was instructed, at the beginning and, at the end of the case, that any failure of the USDA to reasonably accommodate the plaintiff was not an issue for them to decide. Thus, any prejudice that could have been present, and the court does not

find that any of the evidence challenged was unduly prejudicial, was cured by the court's instructions to the jury.

Thus, viewing the case as a whole, assessing each of the witnesses' credibility, and examining the content and detail of their testimony, the court is unable to conclude that the jury's finding of discrimination is a "seriously erroneous result," *See Holmes,* 78 F.3d at 1046-47, or runs contrary to the "clear weight of the evidence." *See J.C. Wyckoff,* 936 F.2d at 1487 (stating a jury's verdict "should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable"). Accordingly, the court will deny plaintiffs' motion for a new trial on this ground.

Reconsideration of Constructive Discharge Claims

Dr. Erbel asks the court to reconsider its decision that she failed to exhaust her administrative remedies on her constructive discharge claim in light of the Sixth Circuit's recent decision in *Deters v. Rock-Tenn Co.,* 2007 WL 2404515 (6th Cir. Aug. 22, 2007). Pursuant to *Deters,* Dr. Erbel asks the court to enter judgment as a matter of law that the USDA constructively discharged her.

In *Deters,* the plaintiff's EEOC charge filed one month after she resigned her employment failed to assert that her supervisor's retaliatory harassment resulted in her constructive discharge. Yet, the Sixth Circuit construed the EEOC retaliation charge prepared by Deters, *pro se,* liberally as including retaliation so naturally growing out of the

underlying charge that it should have been foreseeable to the defendant. *Id.* at *11. Here, however, Dr. Erbel was represented by counsel at the time of the filing of her EEO complaint. After she left the USDA, Dr. Erbel failed to amend her EEO claim or file a separate EEO complaint to add a constructive discharge claim. Nor did she raise the issue of constructive discharge in her two EEO affidavits submitted following her retirement. As Dr. Erbel was represented by counsel at the time of the filing of her EEO complaint and subsequent EEO affidavits, *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) operates to bar her constructive discharge claim.

## Excessive Damages

The USDA argues that the jury verdict regarding lost wages is not supported by the evidence. First, the jury awarded $3,000 in lost wages on Dr. Erbel's suspension claim. The USDA argues that Dr. Erbel's suspension resulted in lost wages for only 8 days at the rate of $288.95 per day. Thus, the maximum damages for lost wages for the suspension total no more than $2,311.60. However, at trial, Dr. Erbel and her doctors testified that as the date approached for her to return to work after serving out the suspension, her emotional distress and anxiety increased substantially. Her doctors removed Dr. Erbel from work for an additional week due to emotional distress resulting from the suspension. Thus, the jury's award of $3,000 for lost wages arising from the suspension is supported by proof that the suspension resulted in more than eight days of lost wages to her. The USDA's motion for remittitur of this item of damages will be denied.

Next, the USDA argues that the jury verdict includes an award for three years' lost wages on the hostile environment claim, *i.e.,* constructive discharge damages, when such an award was not appropriate. A court may render judgment as a matter of law as to some portion of a jury award if it is compelled by a legal rule or if there can be no genuine issue as to the correct calculation of damages. *See Lulaj v. The Wackenhut Corp.,* (January 11, 2008); *Westchester Fire Ins. Co. v. Hanley,* 284 F.2d 409 (6th cir. 1960).

As acknowledged by plaintiff's counsel in closing argument, the most Dr. Erbel requested for lost wages in connection with her hostile work environment claim was for five days in April at the alleged rate of $288.95 per day. If the jury verdict is "beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss," the court should remit the verdict. *Farber v. Massillon Bd. Of Educ.,* 917 F.3d 1391, 1395 (6th Cir. 1990), *quoted in Denhof v. City of Grand Rapids,* 494 F.3d 534, 547 (6th Cir. 2007). Specifically, a court should reduce an award if it is (1) beyond the range support by the proof; (2) so excessive as to shock the conscience; or (3) the result of mistake. *Bickel v. Korean Air Lines Co., Ltd.,* 96 F.3d 151, 156 (6th Cir. 1996). As with the grant of a new trial, the court has discretion to grant remittitur. *Denhof,* 494 F.3d at 547.

Here, it is appears to the court that the damages awarded for lost wages are clearly beyond the range justified by the plaintiff's evidence. The proof at trial showed that Dr. Erbel remained an employee of the USDA until she was approved for disability retirement in the spring of 2003. Dr. Erbel requested to be compensated for lost wages only for the week she was on sick leave in April 2002. Those 5 days would entitle her to

$1,444.75, not $210,000.00. Presumably, Dr. Erbel's attorney requested the amount of damages she believed was supported by the evidence. In order for Dr. Erbel to recover lost wages beyond the date of her disability retirement, the evidence must establish that the employer constructively discharged the employee. *See Lulaj v. The Wackenhut Corp.,* (January 11, 2008); *Jurgen v. EEOC,* 903 F.2d 386, 389 (5th cir. 1990). However, as stated above, the court has found that Dr. Erbel cannot claim damages for constructive discharge as a matter of law. Therefore, lost wages are only due for the week she was on sick leave in April 2002. Accordingly, the court will reduce the damages awarded for lost wages for the hostile work environment claim to $1,444.75.

## Conclusion

For the reasons stated above, defendants' motion for judgment as a matter of law or, alternatively, for a new trial [Docs. 145, 149] is **GRANTED IN PART AND DENIED IN PART:** the USDA's request for remittitur of the damages award for lost wages is **GRANTED**, whereby the court reduces the damages awarded for lost wages for the hostile work environment claim to $1,444.75. The USDA's motion is **DENIED** in all other respects.

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge